**Slip Op. 03-80**

_____

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____


_____
                                          :
NEC SOLUTIONS (AMERICA), INC.,            :
                                          :
          Plaintiff,                      :
                                          :    Consol. Court No. 01-00147
          v.                              :
                                          :
UNITED STATES,                            :
                                          :
          Defendants.                     :
                                          :
_____ :

[Partial Summary Judgment for Plaintiff. Publication on Customs Electronic Bulletin Board of Dep't of Commerce e-mail indicating that suspension of liquidation has been terminated is notice for the purposes of deemed liquidation pursuant 19 U.S.C. § 1504(d).]


                                          Dated:  July 9, 2003

        Paul, Weiss, Rifkind, Wharton & Garrison (Robert E. Montgomery, Jr. and Jesse A. Nicol) for plaintiff.

        Peter D. Keisler, Assistant Attorney General, John J. Mahon, Acting Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (James A Curley), Chi S. Choy, Office of Chief Counsel, United States Bureau of Customs and Border Protection, William J. Kovatch, Jr., Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

# **OPINION**

**RESTANI, Judge:**

This consolidated matter is before the court on cross-motions by Plaintiff NEC Solutions (America), Inc. ("NEC") and Defendant (the "Government") for summary judgment pursuant to USCIT Rule 56.  NEC challenges the timeliness of liquidation of certain color television imports by the United States Customs Service ("Customs").[1]  NEC argues that it is entitled to a refund of certain antidumping duties because Customs failed to timely liquidate related entries within six (6) months of receiving notice that a court-ordered suspension of liquidation had been lifted and, therefore, entries should be deemed liquidated at the rate asserted at entry pursuant to 19 U.S.C. § 1504(d), as amended in 1993 by the North American Free Trade Agreement Implementation Act., Pub. L. No. 103-182, § 641, 107 Stat. 2057, 2204-05 (1993).  In support of its claim, NEC argues that Customs received actual notice that the suspension had been lifted through an electronic message (the "e-mail") issued by the United States Department of Commerce ("Commerce"), and constructive notice when the decision was presumably received by the United States Department of Justice ("Justice").

---

[1]  On February 4, 2003, pursuant to section 1502 of the Homeland Security Act of 2002, P.L. 107-296, 116 Stat. 2178 (Nov. 25, 2002), the President of the United States transmitted to the House of Representatives a "Reorganization Plan Modification for the Department of Homeland Security" (the "Plan") which, effective March 1, 2003, renamed the U.S. Customs Service the "Bureau of Customs and Border Protection."  H.R. Doc. 108-32, at 4 (2003).  While Customs's authority and responsibilities have been incorporated by the Bureau of Customs and Border Protection, the events and decisions at issue here occurred well before this change.  For that reason and for ease of evaluation, the court will refer to the agency as "Customs" throughout.

**JURISDICTION & STANDARD OF REVIEW**

Plaintiff NEC paid all related duties and interest assessed by Customs and filed multiple protests pursuant to 19 U.S.C. § 1515. NEC timely filed this action within 180 days after Customs mailed notice of the denial of Plaintiff's protests. The court has subject matter jurisdiction over the denial of Customs protests under 28 U.S.C. § 1581(a) (2002).[2] Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. USCIT R. 56(d).

**BACKGROUND**

This matter involves the liquidation of color television merchandise manufactured by NEC Corporation and imported by NEC Home Electronics (USA), Inc. into the United States during a seven-year period from April 1, 1982 until February 28, 1989.[3] During that time, the importation of televisions from Japan was subject to a 1971 antidumping duty order. See

---

[2] The Government initially argued that the court lacked jurisdiction over certain entries (Nos. 110-08696269, 110-086972002, 110-08699792, 110-08699792, 110-0701457, and 110-08706373) because the protest (No. 5501-00-100371) was not filed within 90 days after liquidation as required by 19 U.S.C. § 1514(a). The Government later conceded that the protest was in fact timely transmitted by facsimile to its Dallas/Fort Worth office during business hours but, due to time zone differences, Defendant inadvertently misinterpreted the transmission time on the document, which was sent at 5:04 Eastern Standard Time/4:04 Central Standard Time. After recognizing this error, the Government withdrew its jurisdictional objection as to these entries. Def.'s Br. in Reply to Plaintiff's Opposition to the Cross-Motion for Summary Judgment, filed Feb. 7, 2003.

[3] Plaintiff NEC Solutions (America) Inc., previously known as NEC Technologies, Inc., is the successor-in-interest to NEC Home Electronics (USA), Inc.

Television Receiving Sets, Monochrome and Color, From Japan, 36 Fed. Reg. 4597 (Dep't of Treas. Mar. 8, 1971).  Commerce conducted several administrative reviews of the antidumping order over this period.[4]  Because NEC has withdrawn its challenge as to the fourth administrative review period,[5] only the duties paid on entries subject to the fifth through tenth administrative reviews remain in dispute.

A.      **Fifth Through Eighth Review Period**

NEC's entries made between April 1, 1983 and February 28, 1987 were covered by Commerce's fifth through eighth administrative review periods.  See chart, supra n. 4.

---

[4]  The entries at issue were imported by NEC during the following administrative review periods:

| Administrative Review Period | |
|---|---|
| 4th (moot) | April 1, 1982 to March 31, 1983 |
| 5th | April 1, 1983 to March 31, 1984 |
| 6th | April 1, 1984 to February 28, 1985 |
| 7th | March 1, 1985 to February 28, 1986 |
| 8th | March 1, 1986 to February 28, 1987 |
| 9th | March 1, 1987 to February 29, 1988 |
| 10th | March 1, 1988 to February 28, 1989 |

[5]  On April 20, 2001, Commerce issued liquidation instructions to Customs applying a zero margin to NEC's entries made during the fourth administrative review period.  Because these entries were liquidated at the rate asserted by Plaintiff at the time of entry, NEC concedes that its request for declaratory judgment as to these entries are now moot.

Commerce consolidated these entries into a single administrative review.[6]  NEC subsequently

challenged Commerce's calculation of the dumping margin, which covered several

manufacturers.  See NEC Home Electronics, Ltd. v. United States, 18 CIT 336 (1994), aff'd in

part, rev'd in part, 54 F.3d 736 (Fed. Cir. 1995).  The matter was twice remanded to Commerce,

the latter of which required that Commerce redetermine the foreign market value of NEC's

merchandise for comparison with the U.S. price in order to determine the proper dumping

margin.  See NEC Home Electronics, Ltd. v. United States, 22 CIT 167, 172, 3 F. Supp. 2d 1451,

1456 (1998).  Commerce's second remand resulted in a revised antidumping margin for these

periods.[7]  See Final Results of Redetermination (Dep't Commerce November 30, 1998).  On

July 21, 1999, the court sustained those final results, see NEC Home Electronics, Ltd. v. United

States, 59 F. Supp. 2d 1337 (Ct. Int'l Trade 1999), and the injunction suspending liquidation of

Plaintiff's entries covered by the fifth through eighth review periods was lifted when the decision

became final on September 19, 1999.[8]

      Although, 19 U.S.C. § 1516a(e) required that, because the duty rates were changed from

Commerce's original published results, Commerce publish "notice of the court decision . . .

---

[6] The consolidated administrative review resulted in a final dumping margins of 18.21 percent (5th period), 7.37 percent (6th period), 7.16 percent (7th period), and 22.90 percent (8th period).  See Television Receivers, Monochrome and Color, From Japan, 55 Fed. Reg. 35,517 (Dep't Commerce Aug. 28, 1989) (final admin. review).

[7] The remand resulted in substantially lower final dumping margins of 2.20 percent (5th period), 7.37 percent (6th period), 7.16 percent (7th period), and 22.90 percent (8th period).

[8] The decision became final sixty (60) days after the opinion was issued, when the time to appeal expired without the filing of an appeal.  See Fujitsu Gen. Am., Inc. v. United States, 283 F.3d 1364, 1379 (Fed. Cir. 2002).

within ten days from the date of the issuance of the court decision," Commerce admits that it

failed to do so. Several months later, on June 23, 2000, Commerce sent an e-mail to Customs

stating that "RECORDS AT THE DEPARTMENT OF COMMERCE INDICATE THAT

THERE SHOULD BE NO UNLIQUIDATED ENTRIES OF TELEVISION RECEIVERS

MONOCHROME AND COLOR, FROM JAPAN . . . HELD BY CUSTOMS FOR

ANTIDUMPING PURPOSES DURING THE PERIOD 03/10/1971 THROUGH

02/28/1999 . . . ." June 23rd e-mail e-mail from Paul Schwartz, Director, Trade Enforcement &

Control to Directors of Field Operations, Port Directors, subject ADD-0175202-TV-JP (the "e-

mail") (emphasis added).[9]  The e-mail went on to state that if any Customs import office was

suspending liquidation on these entries, Customs officers should report specific information to

Commerce within twenty (20) days. Customs then posted the message on the "Customs

Electronic Bulletin Board," which the Government concedes can be accessed by the public. See

May 22, 2003, Letter from James A. Curley, Attorney for Defendant ("May 22nd Curley Letter").

On January 10, 11, and March 26, 2001, Commerce sent electronic messages to Customs

stating that the order suspending liquidation had been lifted, and that the entries were to be

liquidated at specific antidumping duty rates. Between February 2001 and June 2001, various

Customs ports issued liquidation notices and bills to NEC with respect to the fifth through eighth

period entries. NEC filed twenty (20) protests arguing, inter alia, that the merchandise had

already been liquidated by operation of law pursuant to 19 U.S.C. § 1504(d). NEC argued that

Customs received notice that the suspension had been lifted through Commerce's June 23, 2000

---

[9]  There was an exception for certain entries of televisions produced by another
manufacturer that continued to be enjoined from liquidation by court order.

e-mail and, because the entries were not liquidated within six months (December 23, 2000), the entries should have been deemed liquidated. Customs denied NEC's protests on grounds that the entries had been liquidated within six months of Commerce's January 10, 11, and March 26, 2001 e-mails providing specific liquidation instructions , which Customs concluded were the starting point for the six-month period. NEC timely challenged the fifth through eighth period entries on December 10, 2001.

### B.      Ninth and Tenth Review Periods

NEC's entries made between March 1, 1987 and February 28, 1989, were covered by Commerce's ninth and tenth review periods. The margins for these entries were determined in separate administrative reviews.[10] NEC and others challenged those final results. The court-ordered suspensions of liquidation on these entries were terminated when the actions were dismissed by agreement of the parties. See Order of Dismissal, Zenith Electronics Corp. v. United States, Consol. Court No. 89-04-00212 (Ct. Int'l Trade Dec. 2, 1993); Order of Dismissal, Zenith Electronics Corp. v. United States, Consol. Court No. 90-02-00058 (Ct. Int'l Trade June 20, 1996). There was no formal publication regarding the dismissals and is not clear that any is required as the rates did not change.

Nevertheless, it was not until several years later, on April 28, 2000 and May 15, 2000, that Commerce transmitted liquidation instructions by e-mail. Customs liquidated the entries

---

[10] In its final results, Commerce assigned final dumping margins of 16.32 percent (9th) and 22.90 percent (10th). See Television Receivers, Monochrome and Color, From Japan, 54 Fed. Reg. 13,917 (Dep't Commerce April 6, 1989) (final admin. review); Television Receivers, Monochrome and Color, From Japan, 55 Fed. Reg. 2399 (Dep't Commerce June 24, 1990) (final admin. review).

between June and September of 2000. NEC filed nine (9) related protests arguing again that the

entries should be deemed liquidated under 19 U.S.C. § 1504(d). With respect to the ninth and

tenth periods, NEC raised a different argument, claiming that Customs had received notice when

Justice, which NEC argues represents Customs as legal counsel, received the orders dismissing

the cases. As before, the protests were denied on the ground that the entries were properly

liquidated within six (6) months of Customs's receipt of specific liquidation instructions from

Commerce. On April 24, 2001, NEC timely challenged the results of the ninth and tenth period

administrative reviews. Pursuant to motion by NEC, the court subsequently consolidated NEC's

action related to the ninth and tenth period entries with NEC's action related to the fifth through

eighth period entries.

## DISCUSSION

Section 1504(d) of Title 19 requires that Customs liquidate entries within six (6) months

after receiving "notice" that a suspension of liquidation of such entries has been removed.[11] 19

---

[11] Section 1504(d) provided, in relevant part:

[W]hen a suspension required by statute or court order is removed, the Customs
Service shall liquidate the entry . . . within 6 months after receiving notice of the
removal from the Department of Commerce, other agency, or a court with
jurisdiction over the entry. Any entry . . . not liquidated by the Customs Service
within 6 months after receiving such notice shall be treated as having been
liquidated at the rate of duty, value, quantity, and amount of duty asserted at the
time of entry by the importer of record.

Section 1504(d) was amended in 1994, but the amendment applies only to administrative reviews
commenced on or after January 1, 1995. The administrative reviews covering the fifth through
the eighth periods were commenced prior to January 1, 1995. The parties agree that later
amendments do not affect this case.

U.S.C. § 1504(d), as amended in 1993 by the North American Free Trade Agreement

Implementation Act., Pub. L. No. 103-182, § 641, 107 Stat. 2057, 2204-05 (effective December

8, 1993). If Customs fails to timely liquidate the entries after receiving notice, the entries are

"deemed" liquidated at the rate asserted at the time of entry. See Fujitsu Gen. Am., Inc. v.

United States ("Fujitsu"), 283 F.3d 1364, 1376 (Fed. Cir. 2002) ("[I]n order for a deemed

liquidation to occur, (1) the suspension of liquidation that was in place must have been removed;

(2) Customs must have received notice of the removal of the suspension; and (3) Customs must

not liquidate the entry at issue within six months of receiving such notice."). According to

Commerce, Customs typically receives the relevant notice in the form of an e-mail from

Commerce providing explicit liquidation instructions. The Federal Circuit, however, has

recognized that other methods of notice are sufficient.

In International Trading Co. v. United States, the court rejected the Government's

argument that Customs receives notice, for the purposes of § 1504(d), only when it receives

specific liquidation instructions from Commerce.[12] 281 F.3d 1268, 1276 (Fed. Cir. 2002) ("Int'l

Trading"). The court concluded that, when the suspension is lifted by publication in the Federal

Register, publication itself was sufficient to provide the requisite notice to Customs. Id. at

1275.[13] The court notes that Int'l Trading was addressing a slightly different situation than that

---

[12] In rejecting the Government's argument that notice required liquidation instructions, the court reasoned that "[a]dopting that position would require the courts, after the fact, to examine informal and non-public communications between Commerce and Customs to determine whether and when those communications constituted 'liquidation instructions.'" Int'l Trading, 281 F.3d at 1276.

[13] In accepting publication as a sufficient means of notice, the court reasoned that:

here. In that case, "suspension was removed upon publication of the final results in the Federal

Register" Id. at 1271. Here, the suspensions terminated by the issuance of a final and conclusive

court decision. See, e.g., Hosiden Corp. v. Advanced Display Mfrs. of America, 85 F.3d 589,

590-91 (Fed. Cir. 1996). In Fujitsu, the court concluded that publication in the Federal Register

of notice regarding a final court decision constituted § 1504(d) notice of the lifting of suspension.

> It is just as important that there be "an unambiguous and public starting point for the
> six-month liquidation period" under these circumstances as it is when liquidation of
> entries is suspended pending an administrative review and thereafter the suspension
> is removed when the final results of the review are announced. We therefore
> conclude that Customs received notice of the removal of the suspension of
> liquidation on September 16, 1997, when Commerce published notice of the Fujitsu
> General decision in the Federal Register.

Fujitsu, 283 F.3d at 1381-82 (quoting Int'l Trading, 281 F.3d at 1275). Taken together, Int'l

Trading and Fujitsu make clear that, while specific liquidation instructions from Commerce may

be sufficient,[14] they are not the exclusive method of § 1504(d) notice. The question before the

---

> [T]he Federal Register is a familiar manner of providing notice to parties in
> antidumping proceedings . . . . Moreover, the date of publication provides an
> unambiguous and public starting point for the six-month liquidation period, and it
> does not give the government the ability to postpone indefinitely the removal of
> suspension of liquidation (and thus the date by which liquidation must be completed)
> as would be the case if the six-month liquidation period did not begin to run until
> Commerce sent a message to Customs advising of the removal of suspension of
> liquidation.

Int'l Trading, 281 F.3d at 1275.

[14] In Fujitsu and Int'l Trading Co., the Court of Appeals found that publication before
Commerce's transmission of specific liquidation instruction served as § 1504(d) notice and,
therefore, the court did not address whether the instructions themselves were sufficient.
Liquidation instructions may contain confidential information and may not be public. The court
does not decide what affect liquidation instructions have when there is no public notice that they
have issued.

court, therefore, is whether the communications raised by NEC are adequate.

### A.        Fifth through Eighth Review Periods

With respect to entries during the fifth through eighth review periods, NEC argues that it is entitled to a refund of certain duties because Customs failed to liquidate those entries within six months of receiving Commerce's June 23rd e-mail. NEC argues that, because Commerce failed to timely liquidate the entries, those goods should have been deemed liquidated under § 1504(d) at the rate asserted at the time of entry. Defendant responds that the June 23rd e-mail was not sufficient to put Customs on notice because it did not (1) expressly notify Customs that the suspension of liquidation had lifted on entries from the fifth through eighth review periods; or (2) provide the precise duty rate to be applied.  According to Defendant, Customs "could not have known from a reading of the e-mail that suspension of liquidation of entries covered by the fifth through eighth administrative reviews was removed."  Citing Mitsubishi Elec. Am., Inc. v. United States, 44 F.3d 973, 977 (Fed. Cir. 1994) ("Customs has a merely ministerial role in liquidating antidumping duties," and " merely follows Commerce's instructions in assessing and collecting duties.").

The court notes from the outset that this problem arises from Commerce's admitted failure to properly publish notice of the court's final decision in this matter, as required by 19 U.S.C. § 1516a(e).  Defendant contends that this failure, due to an alleged administrative

oversight,[15] has no consequence because § 1516a(e) is directory rather than mandatory. <u>Fujitsu</u>, 283 F.3d at 1382 ("[T]here is no language in section 1516a(e) that attaches a consequence to a failure by Commerce to meet the ten-day publication requirement, let alone the consequence of deemed liquidation under section 1504(d)."). While that may be technically correct, had Commerce properly published notice of the opinion, as required, the court would not need to

---

[15] According to the Government, this administrative oversight occurred, in part, because of Commerce's "time consuming" publication process.

> When a draft of the amended results is prepared, it is circulated through a chain of reviewers, which include the case analyst, case attorney, program manager, office director, senior attorney, and the responsible Deputy Assistant Secretary. After the review is completed, the amended results are placed in final form and signed by the Assistant Secretary. The amended results then are forwarded to the Central Records Unit where they are certified and sent to the Federal Register for publication.

<u>May 22nd Curley Letter</u>. Commerce's self-imposed bureaucracy, however, is no excuse for delay. Commerce is aware of its statutory obligations and should have crafted its procedures accordingly. The Government brazenly claims that an interested party who believes it will be injured by a delay "is not without remedy" because it can seek relief by petitioning for a writ of mandamus. Citing <u>Timken Co. v. United States</u>, 893 F.2d 337 (Fed. Cir. 1990). The idea that a party must seek such an extraordinary remedy to ensure that Commerce simply fulfills its statutory responsibilities is untenable. By delaying liquidation in this manner, Commerce undermines both the antidumping duty laws and Congress' intent to settle importers' liabilities promptly.

In 2002 and the first four months of 2003, Commerce published a total of eight (8) amended final determinations, none of which were published within the requisite ten days. The most egregious violations occurred (a) 1 year and 3 months, (b) 3 years and 1 month, and (c) 5 years and 8 months after the reviewing court's decisions became final. According to Defendant, there is presently one matter pending before this court concerning a delay of eight years and two months. Such delays are unacceptable. And, of course, here there was no publication at all. The Government argues that "Commerce now has new procedures under consideration that are expected to prevent significant delays in publishing amended final determinations." <u>Id</u>. Whether that is true remains to be seen, and the Government has not committed to meet the statutory deadline at all. In the meantime, the court finds no excuse for Commerce's failure to comply with the statute and will likely craft future orders under the presumption that Commerce will fail to timely publish.

"referee" whether other, less formal, communications are sufficient for § 1504(d) purposes.

Determining the sufficiency of notice under § 1504(d) poses a problem because, as Defendant concedes, the statute does not define or otherwise explain the requirements for such notice. While it is clear from Int'l Trading and Fujitsu that publication in the Federal Register of the agency's final results or the court's final decision are sufficient, it is less clear what is not. The Government, for obvious reasons, advocates a strict approach. For example, Defendant argues that, other than specific liquidation instructions, a sufficient notice must plainly read that "suspension has been lifted." In Fujitsu, however, the court held that publication of notice of the decision in that case met the requirements of § 1504(d) despite the fact that neither the court decision nor Commerce's Federal Register notice specifically mentioned suspension. Fujitsu, 283 F.3d at 1383. Defendant next argues that any § 1504(d) notice not mentioning suspension must contain the applicable duty rate. It is true that, in Int'l Trading, the court held that inclusion of the duty amount, in the absence of express language that the suspension has been lifted, is sufficient. 281 F.3d at 1276 ("'[N]otice' of the duty to be paid is, in effect, notice of the removal of suspension."). The court, however, did not hold that informing Customs of the applicable duty rate was the exclusive alternative method of providing § 1504(d) notice or that is was a strict requirement. While the absence of the duty rate from the June 23rd e-mail places this situation outside the facts of Fujitsu and Int'l Trading, it does not necessarily doom NEC's case.[16]

Despite Defendant's arguments to the contrary, Fujitsu and Int'l Trading do not specify

---

[16] The court notes that, once Customs has notice that suspension has been lifted, there is nothing to prevent it from obtaining the applicable duty rates from Commerce. Customs has six full months to get this done.

the requirements for § 1504(d) notice, except to state that notice should be "unambiguous." The issue, therefore, is whether this particular e-mail unambiguously provided notice to Customs that the suspension had been lifted. The first sentence of the first paragraph provides that "there should be no unliquidated entries of [subject imports] held by Customs for antidumping purposes." The second paragraph identifies an exception for televisions from another manufacturer. "With respect to unliquidated entries of [the other manufacturer's merchandise] that are the subject of [a] court ordered injunction, the Commerce Department continues to be enjoined from ordering the liquidation of these entries until the court disposes of the litigation or dissolves the injunctions." The third paragraph provides that, "with the exception of [the entries discussed in paragraph 2], if any Customs import office is suspending liquidation of entries of this merchandise for antidumping purposes" the officer should respond to Commerce.[17] After receiving the e-mail, Customs posted the message to its Customs Electronic Bulletin Board, which can be accessed by both Customs officials and the public.[18]

Commerce argues that its purpose in distributing the message was not to notify Customs

---

[17] According to Defendant, Commerce received several responses to its inquiry, which were the basis for the formal liquidation instructions issued more in January and March 2001.

[18] According to counsel for Defendant,

When Commerce sends an electronic message to Customs, the message is forwarded to Customs Automated Commercial System ("ACS") for internal distribution. If Commerce's message allows disclosure to the public, Customs, in addition, will send the message to the ACS Administrative Bulletin Board for Automated Broker Interface, which can be accessed by brokers who file electronically with Customs, and to an ACS representative who will then post the message on Customs Electronic Bulletin Board, which can be accessed by the public.

May 22nd Curley Letter (emphasis added).

of the removal of suspension but, instead, to inquire as to whether any unliquidated entries remained. According to Commerce, the June 23rd e-mail was part of a larger project undertaken to have Customs identify a wide variety of unliquidated entries involving numerous antidumping investigations. Commerce contends that, at the time, it did not know whether Customs was holding any unliquidated entries and that the e-mail was only an inquiry.[19] When viewed in the context of Commerce's failure to publish the requisite notice, this post hoc approach to investigating the status of outstanding entries makes sense. Commerce likely realized that it had failed to notify Customs in this matter, which apparently happens frequently, supra n. 15, and was attempting to discretely assess the situation. Commerce's purpose in issuing the e-mail, however, is irrelevant. The only question is whether this message notified Customs that suspension had been lifted.

To anyone reasonably familiar with customs law, the juxtaposition of the mandate "there should be no unliquidated entries" with the exception for certain goods for which a Commerce liquidation order "continues to be enjoined" could only mean that there are no remaining suspensions, court-ordered or otherwise, on subject entries, except for those identified. June 23rd e-mail, ¶¶ 1, 2. Reviewing the June 23rd e-mail as a whole, the court finds that a reasonable Customs official, with knowledge in these matters, would have read the message to provide

---

[19] Commerce argues that, while it knew there should be no unliquidated entries because the suspension had been lifted, it did not know whether unliquidated entries remained and, therefore, was proceeding under a "mistake of fact." First, this was not a mistake of fact. Commerce was simply proceeding with imperfect knowledge. Second, the court notes that Commerce did not know whether unliquidated entries existed because, as we have seen here, Commerce frequently forgets to properly inform Customs that entries should be liquidated. Therefore, any "mistake" was self-inflicted, for which the court finds no excuse.

unambiguously that any suspension of liquidation on NEC's entries had been removed. It is important to note that Customs then posted the message to its Electronic Bulletin Board, which is apparently "a familiar manner" for Customs to disseminate Commerce's liquidation information to Customs officials. Messages are posted only where Commerce expressly "allows disclosure to the public," therefore, there is no question that Commerce was aware that both Customs and the public (i.e. the parties) would have access to this information. May 22nd Curley Letter at ¶ 2. As such, the court concludes that Commerce's June 23rd e-mail to Customs, which was subsequently posted to the Customs Electronic Bulletin Board, is sufficient to serve as § 1504(d) notice. NEC's entries during the fifth through eighth review periods should therefore have been deemed liquidated at the rate asserted at the time of entry. Consequently, the court grants summary judgment to NEC as to these entries and orders Defendant to refund any additional duties imposed.

### B.      Ninth and Tenth Review Periods

With respect to ninth and tenth review periods (and as alternative grounds for the fifth through eighth), NEC argues that Customs received notice that the suspension of liquidation had been lifted when the opinions dismissing the matter, and thereby lifting the suspensions, were received by Justice. NEC's argument is largely founded on an interrogatory response in which a Justice representative states that he represented "the defendant, the United States" in this matter. NEC argues that, because Customs is an agency of the United States, Justice is presumably its counsel and, therefore, Customs had constructive notice by way of Justice's ethical obligation to keep its client informed. In Fujitsu, 283 F.3d at 1379, the court squarely rejected this argument,

finding that service of an opinion on Justice was not service on Customs because "[t]he Justice Department represented Commerce." NEC argues that, if the CAFC had the facts of this case, it would have decided differently. Whether that is true, the court cannot know. For the purposes of this case, however, the court remains bound by Fujitsu. As such, the court finds that Defendant is entitled to summary judgment as to entries related to the ninth and tenth review periods.

## CONCLUSION

For the foregoing reasons, the court finds that the June 23rd e-mail from Commerce to Customs provided notice, for the purposes of §1504(d), that the court order suspending liquidation of entries during the fifth through eighth review periods had been lifted. Because Customs did not liquidate within six months, the entries should have been deemed liquidated. NEC is entitled to a refund of any additional duties imposed. The court grants summary judgment to NEC as to these entries. With respect to the ninth and tenth review periods, NEC's constructive notice argument is foreclosed by Fujitsu. The court grants summary judgment to Defendant as to these entries.

The parties are hereby ordered to confer and Plaintiff should file an appropriate proposed judgment sheet with the court indicating the proper amount be refunded, with interest if applicable, within twenty (20) days.  Defendants may file any objections within seven (7) days thereafter.

SO ORDERED.


_____
Jane A. Restani
Judge

DATED:  New York, New York

      This 9th of July, 2003.

ERRATA

NEC Solutions (America), Inc., v. United States, Consol. Court No. 01-00147, Slip Op. 03-80 dated July 9, 2003.

Page 6:        On the 7th line, replace "June 23rd e-mail e-mail" with "June 23rd e-mail".

Page 12:       On the 18th line of footnote 15, replace:

In 2002 and the first four months of 2003, Commerce published a total of eight (8) amended final determinations, none of which were published within the requisite ten days. The most egregious violations occurred (a) 1 year and 3 months, (b) 3 years and 1 month, and (c) 5 years and 8 months after the reviewing court's decisions became final.

with

Suspension of liquidation is not removed until the reviewing court's decision becomes final. Fujitsu, 283 F.3d at 1379 (citing Timken, 893 F.2d at 339-40 ("[a]n 'action' does not end when one court renders a decision but continues through the appeal process.")). Commerce states, therefore, that it is required to publish amended final determinations within ten days of the expiration of the appeals period. See May 22nd Curley Letter at 2. For the purposes of this case, the court accepts the government's statement. It is at least clear that the government must publish promptly.
In 2002 and the first four months of 2003, Commerce published a total of eight (8) amended final determinations. Commerce admits that none were published within ten days of the related court decision becoming final for all purposes. Id. The most egregious violations occurred when Commerce published notice (a) 1 year and 3 months, (b) 3 years and 1 month, and (c) 5 years and 8 months after the court decision became final.

Page 13:       On the 5th line, after "less clear what is not.", add footnote 15a:

As to the 5th through 8th review periods, the possibility of further appeal prevented the court's decision here from becoming final for all purposes until sixty (60) days after issuance. See discussion supra note 15. Thus, publication within ten (10) days of issuance of this court's decision would not have signaled the cessation of suspension of liquidation. However, publication of notice of the final decision after the sixty (60) day period elapsed would have provided clear notice. Instead, previous duty rates were superceded without any notice ever appearing in the Federal Register.

July 21, 2003.